UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-80040-CIV-MARRA

DONALD SOLODAR and CAROLLE SOLODAR,

Plaintiffs,

vs.

OLD PORT COVE LAKE POINT TOWER
CONDOMINIUM ASSOCIATION, INC., et al,

Defendants.
_____/

**OPINION AND ORDER**

This cause is before the Court upon Plaintiff Carolle Solodar's Motion for Preliminary Injunction (DE 5); Plaintiffs Donald Solodar and Carolle Solodar's Motion for Hearing on Preliminary Injunction (DE 6); Defendant Old Port Cove Lake Point Tower Condominium Association, Inc.'s Motion for Leave to File Surreply (DE 19) and Plaintiffs Donald Solodar and Carolle Solodar's Motion to Strike Surreply (DE 21). The Court has carefully considered the motions and is otherwise fully advised in the premises.

I.  Findings of Fact

Plaintiffs Donald and Carolle Solodar ("Plaintiffs") currently own and reside at 100 Lakeshore Drive, Unit # L-10, North Palm Beach, Palm Beach County, Florida 33408. (C. Solodar Decl. ¶ 2, Ex. A, DE 5-1.) Ms. Solodar suffers from cardiovascular disease and experienced a heart attack in May of 2009. (Id. at ¶ 3; Dr. Jyoti Mohanty Decl. ¶¶ 2, 4.)

Defendant Old Port Cove Lake Point Tower Condominium Association, Inc. ("Lake Point Tower" "Defendant") is a Florida non-profit corporation, licensed and doing business in Palm

Beach County.  Lake Point Tower's property is comprised of a 22-story tower containing eight two and three bedroom apartments on each floor.  On the perimeter, facing Lake Worth, are 12 Lanai residences. Each Lanai residence is a two-story unit, with stairway access to the second floor, including the master bedroom.  It is a 55 and older residential community, with the average age of the residents being over 78 years old.  (Jan Muelder Aff. ¶ 4, Ex.  A, DE 13-1.)

Residents are assigned parking in a garage under the tower and lanais.[1]  There are a total of 222 paces between Plaintiffs' assigned parking space in the garage and Plaintiffs' residence. (Determination of Reasonable Grounds, Palm Beach County Office of Equal Opportunity, Ex. C, DE 5-3.)  Immediately adjoining the front walk of Plaintiffs' unit is the "South Parking Deck," consisting of ten parking spaces. (C. Solodar Decl. ¶ 5.)  Until November 2010, Ms. Solodar parked in the South Parking Deck, which was 32 paces from her front door. (Id. at ¶ 6; Determination of Reasonable Grounds, Palm Beach County Office of Equal Opportunity.)  The South Parking Deck is a "heavily trafficked small concrete lot adjacent to the building's service entrance corridor and provides access for garbage trucks, work trucks and vans carrying construction equipment, tools and deliveries."  During weekdays, numerous construction and commercial vehicles park in and around the service area, which creates substantial congestion, results in the blocking in of vehicles and causes overflow issues.  There is no alternative parking for vendors and contractors, and there is no alternative location for vendors and contractors to unload their vehicles and access the building. (Muelder Aff. ¶ 10; David Gregg Aff. ¶¶ 6-7, Ex. M, DE 13-13; Pictures of Service Area taken on April 12, 2011, Ex. C, DE 13-3.)

---

[1] Defendant did not provide record support for this statement, however, Plaintiffs do not dispute it.

In November of 2010, Mr. Solodar complained about vendors blocking in his car on the South Parking Deck.[2] Soon thereafter, Plaintiffs were advised that the Board of Governors ("Board") was planning to convert the South Parking Deck to a vendors only parking area..[3] (C. Solodar Decl. ¶ 7.) On November 23, 2010, Plaintiffs sent a letter to Defendant's Board, requesting the establishment of a handicapped parking space on the South Parking Deck, complaining that the "removal of the owner loading zone is uncalled for," suggesting that the ten parking spaces be restricted to unit owners and vendors servicing their needs, and directing that management employees park in another area. In addition, Plaintiffs requested that a handicapped space be created or "in the alternative, leave the single unit owner loading zone spot." (November 23, 2010 letter, Ex. E, DE 13-5.)

The Board granted the request for a temporary loading zone in the front of the service area. (Loading zone photograph, Ex. F, DE 13-6.) In addition, the Board informed Plaintiffs that a sign would be placed designating the South Parking Deck as a "service area" for the purpose of allowing only vendors and commercial vehicles to park there during business hours. Management employees would not be permitted to park in this area, unit orders could unload or load their vehicles in this area, but allowing a handicapped parking space in the service area was "too risky." (November 26, 2010 email from the Board to Plaintiffs, Ex. 5, DE 5-1.) The

---

[2] Ms. Solodar routinely complains to management about her car being blocked in by vendors on the South Parking Deck. (Muedler Aff. ¶ 11.)

[3] In its response memorandum, Defendant states that in years past enforcement of the South Parking Deck's parking restrictions was lax and the former chairman of Lake Point Tower's Building Committee, placed signs in this parking area which purported to allow owners' parking, even though he did not have the authority to do so. (Resp. at 4-5.) These assertions are not supported by record evidence.

minutes of the February 21, 2011 Board meeting reflect that while in the past having residents occasionally park in the service area during business hours had not been a problem, there was now an issue with residents parking in this area. The Board determined it would only allow this parking area to be used by vendors during business hours. (February 21, 2011 Board minutes, Ex. 6, DE 5-1.)

On March 7, 2011, Plaintiffs' attorney contacted Lake Park Tower, and stated that: (1) the Board's recent actions materially restricted the use of a common element; (2) Plaintiffs should not have been refused a handicapped parking space on the South Parking Deck and (3) Ms. Solodar is disabled and parking on the either the underground parking garage or upper deck imposes an undue hardship. (March 7, 2011 correspondence from Plaintiffs' attorney to Lake Park Tower, Ex. G, DE 13-7.)

In response, Defendant's attorney sent a letter to Plaintiffs' counsel seeking additional information regarding Ms. Solodar's alleged disability and her health care practitioner's credentials. (March 9, 2011 letter from Lake Park Tower's attorney to Plaintiffs' attorney, Ex. H, DE 13-8.) Plaintiffs' attorney then provided a doctor's note and a copy of Ms. Solodar's handicapped decal.[4] (March 24, 2011 letter from Plaintiffs' attorney to Lake Park Tower, Ex I, DE 13-9.) Next, on April 4, 2011, Defendant's attorney informed Plaintiffs' attorney that he failed to provide evidence that an assigned parking space in the vendor parking lot is medically necessary. Nonetheless, the Board offered to make the following accommodation at Plaintiffs'

---

[4] Plaintiffs rely on a doctor's note dated June 22, 2011, which states, in part, that Ms. Solodar needs to be able to park within 15 feet of her residence. (June 22, 2011 letter from Dr. Jyoti Mohanty to Ms. C. Andrus, Ex. 1, DE 5-1.) The Court finds this letter to be utterly lacking in credibility and therefore carries no weight with the Court. Indeed, if Ms. Solodar could not walk more than 15 feet she would be wheelchair-bound and unable to walk in her own residence.

expense: (1) the installation of an automatic door opener on the doorway from the parking garage to the stairs leading to Plaintiffs' unit and (2) the installation of non-skid traction strips on those stairs. (April 4, 2011 letter from Lake Park Tower to Plaintiffs' attorney, Ex. 11, DE 5-1.) Plaintiffs' attorney rejected this proposal, stating that to require Ms. Solodar to park in the downstairs garage and climb steps would impose a risk to her, whereas the requested handicapped parking space would be closer and cost little to provide. (April 12, 2011 letter from Plaintiffs' attorney to Lake Park Tower, Ex. 12, DE 5-1.) On December 27, 2011, Defendant summarized its three proposed accommodations for Ms. Solodar: (1) a designated 15 minute owner's loading zone in the service area for use of Lanai owners during business hours; (2) in exchange for one of her current garage spaces, a designated parking space on the parking deck in front of the building for Ms. Solodor's exclusive use, a space that is the closest possible space to Ms. Solodar's unit that also preserves the safety and security of her and the larger Lake Park Tower community and (3) in exchange for one of her current garage spaces, a designated parking space in the garage, directly adjacent to the tower elevators, for Ms. Solodar's exclusive use. That letter also noted that Ms. Solodar is free to park on the South Parking deck in accordance with the yearly moratorium on vendor and contractor parking.[5] (December 27, 2011 letter from Lake Park Tower to Plaintiffs' attorney, Ex. F, DE 5-6.)

---

[5] There is a moratorium period on vendors and contractors working at the building between December 20th and March 1st every calendar year, with the exception of emergency repair services. As such, during this time period, the parking restrictions are not in effect.

II.  Conclusions of Law

In granting a preliminary injunction, the Court must determine if the movant has demonstrated both a substantial likelihood of success on the merits and whether an irreparable injury would occur unless the injunction issues. Additionally, the movant bears the burden to show that the threatened injury to the movant outweighs any damage the proposed injunction may cause the opposing party and that the injunction would not be adverse to the public interest. See Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc., 303 F.3d 1242, 1246 (11th Cir. 2002); McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir.1998). Granting a preliminary injunction falls within the Court's equitable powers and is appropriate when a legal right has been infringed by an injury for which there is no adequate legal remedy. Alabama v. U.S. Army Corps of Engineers, 424 F.3d 1117, 1127 (11th Cir. 2005); Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004).

The Fair Housing Act ("FHA") makes it illegal to discriminate "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap . . ." 42 U.S.C. § 3604(f)(2). Handicap discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

To prevail on a claim brought pursuant to 42 U.S.C. § 3604(f)(3)(B), a plaintiff must establish that (1) he is disabled or handicapped within the meaning of the FHA; (2) he requested a reasonable accommodation; (3) such accommodation was necessary to afford him an opportunity to use and enjoy his dwelling and (4) the defendant refused to make the requested

accommodation.  Hawn v. Shoreline Towers Phase I Condominium Assoc., Inc., 347 F. Appx. 464, 467 (11th Cir. 2009) (citing Schwarz v. City of Treasure Island, 544 F.3d 1201, 1218-19 (11th Cir. 2008).  A plaintiff, however, is not entitled to the accommodation of his or her choice, but is entitled only to a reasonable accommodation.  Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir. 1997). "Whether an accommodation is reasonable depends on specific circumstances." Terrell v. USAir, 132 F.3d 621, 626 (11th Cir. 1998).

For purposes of this motion only, the Court will assume, without deciding, that Ms. Solodar can demonstrate a likelihood of success on the merits that she is disabled within the meaning of the FHA.  Instead, the Court will focus on whether Ms. Solodar is likely to succeed on the merits on the question of whether Defendant has failed to provide her a reasonable accommodation.

Clearly, Defendant granted Plaintiffs' request for an accommodation when it designated an owners' loading zone on the South Parking Deck, and offered to provide either a handicapped parking space directly in front of Lake Point Tower or directly adjacent to the elevator in the tower garage.  Indeed, Defendant granted Plaintiffs' very first request for an accommodation; that is, the establishment of an owners' loading zone, which was requested by Plaintiffs prior to retaining counsel. Later, Defendant made other attempts to satisfy Plaintiffs, while balancing the needs of the entire Lake Park Tower community, by offering Plaintiffs a designated parking space in two different locations of their choice.  By virtue of having proposed these three accommodations, the Court finds that it unlikely that Ms. Solodar will succeed in showing that Defendant acted unreasonably.  See Stewart, 117 F.3d at 186 (finding the defendant met its burden to accommodate the plaintiff's disability when it offered five different accommodations).

This conclusion is buttressed by the record evidence that the South Parking Deck is heavily congested and overburdened with vehicles servicing all of Lake Point Tower's residents, that there is no alternative parking for these service vehicles, and vendors are often forced to double-park their vehicles. See Loren v. Sasser, 309 F.3d 1296, 1302 (11th Cir. 2002) ("Whether a requested accommodation is required by law is highly fact-specific, requiring case-by-case determination.") (internal quotation marks omitted). While the accommodation provided by Defendant may not have been Ms. Solodar's preference, that does not make it unreasonable. Id.; see also Lyons v. Legal Aid Society, 68 F.3d 1512, 1517 (2d Cir. 1995) ("The requirement of reasonable accommodation does not entail an obligation to do everything humanly possible to accommodate a disabled person"); Stewart, 117 F.3d at 1285 ("the word 'reasonable' would be rendered superfluous . . . if [defendants] were required in every instance to provide [plaintiffs] 'the maximum accommodation or every conceivable accommodation possible.'"). Indeed, the evidence shows that Plaintiff's request is unreasonable given that Ms. Solodar routinely complains about her car being blocked in by service vehicles. Based on the evidence before the Court, the Court finds that Ms. Solodar is unlikely to succeed in meeting her burden that the proposed accommodation is unreasonable. Loren, 309 F.3d at 1302 ("Under the Fair Housing Act, plaintiffs have the burden of proving that a proposed accommodation is reasonable").

In making this finding, the Court rejects Plaintiffs' reliance on 24 C.F.R. § 100.204(b)(2).[6] The example in this regulation differs from the facts specific to this case;

---

[6] § 100.204 Reasonable accommodations.

(a) It shall be unlawful for any person to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal

namely, the regulation does not address providing a parking space in an overburdened and small service area.  Furthermore, Defendant did provide Plaintiffs with a parking space nearer their unit than their assigned parking space, and the Court does not read this regulation as requiring Defendant to provide Plaintiffs with a parking space of their choosing.  Likewise, the Court rejects Plaintiffs' reliance on Shapiro v. Cadman Towers, Inc., 51 F.3d 328 (2d Cir. 1995).  In that case, the apartment building refused to make *any* accommodation regarding the plaintiff's disability. Id. at 336.  Moreover, the Shapiro Court upheld the district court's factual finding that there were four available parking spaces for handicapped individuals that would not impair the

---

> opportunity to use and enjoy a dwelling unit, including public and common use areas.
>
> (b) The application of this section may be illustrated by the following examples:
>
> Example (1): A blind applicant for rental housing wants live in a dwelling unit with a seeing eye dog. The building has a no pets policy. It is a violation of § 100.204 for the owner or manager of the apartment complex to refuse to permit the applicant to live in the apartment with a seeing eye dog because, without the seeing eye dog, the blind person will not have an equal opportunity to use and enjoy a dwelling.
>
> Example (2): Progress Gardens is a 300 unit apartment complex with 450 parking spaces which are available to tenants and guests of Progress Gardens on a first come first served basis. John applies for housing in Progress Gardens. John is mobility impaired and is unable to walk more than a short distance and therefore requests that a parking space near his unit be reserved for him so he will not have to walk very far to get to his apartment. It is a violation of § 100.204 for the owner or manager of Progress Gardens to refuse to make this accommodation. Without a reserved space, John might be unable to live in Progress Gardens at all or, when he has to park in a space far from his unit, might have great difficulty getting from his car to his apartment unit. The accommodation therefore is necessary to afford John an equal opportunity to use and enjoy a dwelling. The accommodation is reasonable because it is feasible and practical under the circumstances.

9

rights of other non-handicapped building tenants.[7] Id.

Having found that Plaintiffs have failed to establish the essential requirements of likelihood of success on the merits, it is unnecessary to consider the other required showings. Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1) Plaintiffs' Motion for Preliminary Injunction (DE 5) is **DENIED.**

2) Plaintiffs' Motion for Hearing on Preliminary Injunction (DE 6) is **DENIED**.

3) Defendant's Motion for Leave to File Surreply (DE 19) is **DENIED.**

4) Plaintiffs' Motion to Strike Surreply (DE 21) is **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 29th day of February, 2012.

_____
KENNETH A. MARRA
United States District Judge

---

[7] The Court also rejects Plaintiffs' argument that "there is no burden to those vendors or contractors who are not loading or unloading to park in the North Parking Deck." (Reply at 9.) In support, Plaintiffs cite to Exhibit 2 of Ms. Solodar's declaration. This exhibit, however, is merely a picture of Lake Park Tower purporting to show the distance between the service entrance of the Tower from the North Parking Deck. There is no evidence demonstrating that there are available parking spaces on the North Parking Deck for all the vendors. Providing Plaintiffs with one assigned parking space on the North Parking Deck is not the same as providing all the vendors with parking spaces on the North Parking Deck, especially when there is evidence showing that numerous vendors service this complex. (Pictures of Service Area on April 12, 2011.)