UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-80040-CIV-MARRA

DONALD SOLODAR and CAROLLE SOLODAR,

Plaintiffs,

vs.

OLD PORT COVE LAKE POINT TOWER
CONDOMINIUM ASSOCIATION, INC., et al,

Defendants.
_____/

## OPINION AND ORDER

This cause is before the Court upon Plaintiffs' Motion for Summary Judgment (DE 51); Defendants' Motion for Summary Judgment (DE 56); Plaintiffs' Motion to Strike Portions of Second Declaration of Andy Romero (DE 72) and Defendants' Motion to Strike Plaintiffs' Untimely Notice of Filing and Declaration of Donald Solodar (DE 80).  The Court has carefully considered the Motions and is otherwise fully advised in the premises.

I.  Background[1]

This case arises from Plaintiffs Donald and Carolle Solodar's ("Plaintiffs") claim of discrimination in violation of the Federal and Florida Fair Housing Acts.  Plaintiffs have sued Defendants Old Port Cove Lake Point Tower Condominium Association, Inc. ("Lake Point Tower"),  Jan Muelder, Robert Marschall, Kenneth Weiss, Robert Quig, Donald Hackl, John Manning, David Gregg ("Board of Governors"),  M.M.I of the Palm Beach, Inc., Cathie Carr and Andy Romero's ("MMI Defendants) (collectively, "Defendants") claiming that they wrongfully

---

[1] The Court presumes familiarity with its prior Orders.

rejected Mrs. Solodar's request for a parking space in the Lake Point Tower's service area due to her disability.  Relevant portions from the factual record, as culled from affidavits, exhibits, depositions, answers, answers to interrogatories, for the purpose of this motion, are as follows:

Lake Point Tower's property is comprised of a 22-story tower containing eight two bedroom and eight three bedroom apartments on each floor.  On the perimeter of the property are twelve lanai residences. Each lanai residence is a two-story unit, with stairway access to the second floor, including the unit's master bedroom. (Jan Muelder Aff. ¶ 4, Ex. A, DE 13-1.) Residents are assigned parking spaces in a garage under the tower and lanais. There are a total of 222 paces between Plaintiffs' assigned parking space in the garage and Plaintiffs' residence. (Determination of Reasonable Grounds, Palm Beach County Office of Equal Opportunity, Ex. C, DE 5-3.)  Immediately adjoining the front walk of Plaintiffs' unit is the "south parking deck" or "service area," consisting of ten parking spaces. (C. Solodar Decl. ¶ 5; Nov. 26, 2012 email from Board to Plaintiffs, Ex. 5, DE 5-1.)

Mrs. Solodar is a 70 year old woman with a history of cardiovascular disease and hypertension. After her heart attack, Mrs. Solodar's physician, Dr. Jyoti Mohanty, prescribed a permanent disability parking permit and classified her as "class III" which indicates shortness of breath, fatigue and dizziness after one city block. Dr. Mohanty also prescribed an exercise and medication regimen to improve her heart function and blood flow to the heart muscles. Mrs. Solodar has been advised that she is at increased risk of heart attack, stroke and sudden death. She has also been advised of the need to call 911 and go directly to the emergency room if there is any chest pain. In April of 2012, Dr. Mohanty decided to do another cardiac catherization on Mrs. Solodar and she was given a second stent.  Dr. Mohanty states that the disease is

progressive and further stents will be required. In addition, according to Dr. Mohanty, Mrs. Solodar's mobility and everyday life activities are limited by her condition.[2] Due to her condition, she experiences shortness of breath and dizziness. This shortness of breath causes a lack of blood flow, arrhythmias, and general tiredness. Dr. Mohanty has written three different letters on behalf of Mrs. Solodar in order to have a closer parking space where she would not be required to climb exterior stairs or to cause shortness of breath. He believes that Mrs. Solodar needs to be able to park in a space as close to her unit as available because the closer the space, the more beneficial it would be for her health. Any spot within 200 feet, without climbing stairs or ramps, or otherwise causing fatigue would be reasonable. (Dr. Jyoti Mohanty Decl. ¶ ¶ 2, 7, 10, 13, 15, 17, 19, 21-22, 24, DE 53-1.)

Dr. Charles Russo states the following with respect to Mrs. Solodar's medical condition:

> I am a board certified cardiologist licensed to practice medicine in the state of Florida since 1985. I have been in clinical practice for more than 25 years treating patients on a daily basis. I am also board certified in internal medicine, nuclear cardiology and lipidology. I also personally visited the subject property to view and evaluate the parking facilities currently available to the patient, as well as the parking accommodations offered by Lake Point Tower.
>
> It is my professional opinion within a reasonable degree of medical certainty that Carollee Solodar is not substantially limited in any major life activity. Further, based on an assessment of the patient's actual physical condition as reflected in her medical records and the opinions of her treating cardiologists, and using evidence based and objective standards including New York Heart Association Functional Class designations and exercise stress testing data, it is clear that Mrs. Solodar has never objectively exceeded New York Heart Association Functional Class II and in my opinion would never have qualified for a handicapped parking placard.

---

[2] According to Mrs. Solodar, when she walks, she experiences tightness in her chest, sits down frequently, has to stop to rest and tires easily. She frequently takes naps. (C. Solodar Dep. 52-53, 55, DE 55-6.)

> A New York Heart Association Class I patient is defined as a patient with cardiac disease but without resulting limitation in physical activity. For such a patient, ordinary physical activity does not cause undue fatigue, palpitation, dyspnea, or anginal pain. A New York Heart Association Class II patient is defined as a patient with cardiac disease resulting in slight limitation of physical activity. A New York Heart Association Class II patient is comfortable at rest; however, moderate physical activity results in fatigue, palpitation, dyspnea, or anginal pain. By November 2010 by objective criteria, Mrs. Solodar's heart had recovered from the May 2009 event and I would have categorized her as a New York Heart Association Class I patient.
>
> The patient would not have been eligible for a handicapped parking placard, as a New York Heart Association Class II patient such as Mrs. Solodar suffers only a slight limitation of physical activity and is not substantially limited in any major life function. Pursuant to medical standards in the practice of clinical cardiology, individuals of comparable medical pathology to Mrs. Solodar do not require handicapped parking placards. As with Mrs. Solodar, they are Class I or Class II patients and are not substantially limited in their mobility or ability to climb stairs orwalk substantial distances. The severity of Mrs. Solodar's subjective complaints are not supported by any objective medical evidence and are no worse than the mobility issues suffered by many aging adults.
>
> There is no reasonable medical justification as to why Mrs. Solodar requires the accommodation she is seeking, which is a permanent handicapped parking space within 15 feet of her front door. New York Heart Association Class III patients awaiting heart transplants do not require such an accommodation.
>
> [I]t is my opinion that Carollee Solodar is not substantially limited in her major life functions of walking, climbing stairs, or mobility, and the parking facilities at Lake Point Tower are more than adequate for her health and well being.

(Charles Russo Decl. ¶¶ 4-11, DE 55-4 .)[3]

In November of 2010, the Board of Governors advised Plaintiffs that the south parking deck or service area would now be a vendor's only parking area. (C. Solodar Decl. ¶ 7, Ex. A, DE 5-1.) On November 10, 2010, Plaintiffs requested that Lake Point Tower either designate a parking space for Mrs. Solodar's exclusive use or, "alternative[ly]" have an owner loading zone

---

[3] The president of the Board of Governors testified that the Board of Governors did not believe that Mrs. Solodar had a disability. (Muelder Dep. 70, 83.)

parking space in the service area. (November 10, 2010 letter from Plaintiffs to Board of Governors, DE 13-5.) The Board of Governors designated a fifteen minute temporary loading zone in the area, directly in front of Plaintiffs' residence. (Jan Muelder Feb. 10, 2012 Aff. ¶ 8; Photograph of loading zone, DE 13-6.) Defendants also offered Mrs. Solodar, in exchange for her current parking space in the garage, a designated parking space on the parking deck in front of the building for her exclusive use or, a designated parking space in the garage, directly adjacent to the tower elevators, for her exclusive use. (December 27, 2011 letter from Lake Park Tower to Plaintiff's attorney, Ex. F, DE 5-6.)

According to Defendants, the service court area is a heavily trafficked small concrete lot adjacent to the building's service entrance corridor. There is no alternative location in the building for vendors or contractors to unload their vehicles or enter the building with equipment and supplies aside from the service court and the adjacent entrance corridor.[4] The service court area was designated in the original architectural plan, the engineering survey and the condominium documents as a service area. (Andy Romero Jan. 11, 2013 Aff. ¶ 4. DE 55-1.) Lake Point Tower has safety, logistical and liability concerns related to allowing a unit owner to park permanently in the service area. (Robert Quig Decl. ¶¶ 5-6, DE 55-2; Donald Hackl Dep. 32-34, DE 55-9.)

The January 11, 2013 affidavit of Andy Romero, the building manager for Lake Point

---

[4] Plaintiffs point out that when there are no available spaces in the service court, vendors have been directed to park in the front of the building in the upper parking deck. Contractors also park in the upper parking deck when the service court is full. Sometimes the MMI personnel tell vendors to move their vehicles if they find that vendors are blocking other vendors. (Chappell Dep. 31, 41, 43-44.)

5

Tower, states in part :

> The staff and I have observed Mrs. Solodar walk substantial distances on and around Lake Point Tower's property on a regular basis and walk on the fitness center's treadmill for extended periods of time. The treadmills in the fitness center appear on Lake Point Tower's pre-existing security cameras, and we can generally see Mrs. Solodar on the treadmill every other day for periods of at least 25 to 30 minutes, if not longer.
>
> The staff and I have also personally observed Mrs. Solodar voluntarily parking her vehicle outdoors on Lake Shore Drive, approximately 330 feet from her residence. Mrs. Solodar's route to her residence from this parking space is completely exposed to the elements, takes her up a steep ramp leading to her residence, and is significantly further than other available parking, including her assigned parking space inside the parking garage (by way of the tower elevator while avoiding all stairs) as well as other parking spaces offered to the Solodars by Lake Point Tower. On one occasion, I, along with several members of Lake Point Tower's Board of Governors and Lake Point Tower's administrative assistant, were in Lake Point Tower's management office when we observed Mrs. Solodar take the described route. Mrs. Solodar was walking very quickly from her white Lexus SUV, voluntarily parked far down the street in the aforementioned location, to her residence. On another occasion, we observed Mrs. Solodar walking several hundred yards down Lake Shore Drive. The staff and I often see Mrs. Solodar walking up and down Lake Shore Drive, including distances that are significantly further than her assigned parking space or either of the alternative parking accommodations suggested by Lake Point Tower's Board of Governors. On or about January 4, 2013 at approximately 12:00 noon, Mrs. Solodar was observed walking down Lake Shore Drive to another building located in the Old Port Cove community while it was hot, humid, and sunny. We measured the distance from her front door to the building she had entered as 405 feet.
>
> The staff and I have seen Mrs. Solodar walk from her currently assigned parking space to her Lanai by way of the tower elevator. Mr. Solodar is often home at these times and is capable of picking her up or dropping her off in the unit owner loading zone or at their front door if she were unable to walk the distance to and from her vehicle. Mrs. Solodar has been offered a parking space near the elevator banks and in front of the tower building. Either of the alternative parking accommodations suggested by Lake Point Tower's Board of Governors is a shorter walk to Mrs. Solodar's unit than her currently assigned parking space.

(Andy Romero Jan. 11, 2013 Aff. ¶¶ 9-11.)

Regarding the service court, Mr. Romero states the following:

> The service court area is a heavily trafficked small concrete lot adjacent to the building's service entrance corridor and provides access for garbage trucks, work trucks and vans carrying construction equipment, tools, and deliveries. There is no alternative location in the

> building for vendors or contractors to load and unload their vehicles or enter the building with equipment and supplies aside from the service court and the adjacent entrance corridor. There is also no other parking facility at Lake Point Tower capable of accommodating large trucks, such as moving trucks, box trucks, garbage trucks, and trucks or vans carrying heavy equipment and supplies.
>
> Over the last several years . . . the service court has gotten significantly more congested during operational hours as a result of increased vendor and contractor activity in the building. I attribute the substantial increase in vendor and contractor activity [to] the fact that the building is at or near maximum capacity, is over thirty years old, and infrastructure and residential renovation projects have been a priority. As a result, it has become more and more readily apparent that navigation and parking in the service court area is a significant logistical challenge and a safety hazard to anybody present in the service court during business hours.
>
> During the weekday business hours, numerous construction and commercial vehicles park in and around the service area, creating substantial congestion, blocking in vehicles, and causing overflow issues. The service area is not an orderly group of parking spaces, and designating a permanent space for the Solodars' exclusive and permanent use is not a simple or reasonable accommodation [of] merely requiring one vendor or contractor to park elsewhere. Vendors and contractors routinely double-park their vehicles and park in numerous unmarked parking spaces throughout the service area, causing substantial congestion and blocking traffic.
>
> We attempt to keep the area as uncongested as possible and try to direct standard size automobiles to the front parking deck when space is available. However, space on the front parking deck is not always available, large trucks, which cannot park on the front deck, regularly and unavoidably block the service area while loading, unloading, and parking, and a staff member is not available to stand in the service area and direct traffic on a continuous basis. Accordingly, we believe it unavoidable that the large numbers of vendors and contractors servicing the building will continue to block and congest the service area during the business hours, and Lake Point Tower must continue to manage the area to the best of its ability, while balancing the needs of the entire Lake Point Tower community.

(Andy Romero Jan. 11, 2013 Aff. ¶ ¶ 4-5, 7.)

Robert Quig, the head of the Board of Governors' Building Committee, states the following:

> As head of the building committee, I attribute the substantial increase in vendor and contractor activity to the fact that the building is over thirty years old, and infrastructure and residential renovation projects have been a major priority. As a result, it is readily apparent that navigation and parking in the service court area is a significant logistical challenge and is a significant safety hazard to any resident present in the service court during business hours. Primarily as a result of the congestion and unsafe conditions in the service court area,

compounded by the increase in traffic and continuous complaints from vendors, contractors, and residents, including several heated altercations between the Solodars and staff or vendors, the Board of Governors passed a new set of regulations to reinforce and clarify the commercial nature of the service court area.

It has been suggested by the Solodars that in order to relieve the congestion of the service area, that vendors and contractors be directed to park elsewhere. This is not an option as there is no other parking facility at Lake Point Tower capable of accommodating large trucks, such as moving trucks, box trucks, garbage trucks, and trucks or vans carrying heavy equipment and supplies. This is because the entire service court area has been reinforced to have a greater live load limit than the upper parking deck in front of the building. In contrast, the upper parking deck in front of Lake Point Tower has not been reinforced except for a clearly marked path around the building that allows fire truck access to the north side of the building in the event of an emergency.[5] The actual parking spaces on the upper parking deck have not been reinforced and cannot be utilized by trucks or other vehicles carrying heavy equipment. Accordingly, the large commercial vehicles that service Lake Point Tower and cause the greatest amount of congestion in the service area are directed not to park on the front parking deck. It must be noted that the upper parking deck is the roof of the underground parking garage, and directing large commercial vehicles to park on the unreinforced front deck would endanger the lives and property of Lake Point Tower's residents.

(Quig Decl. ¶¶ 5-6, DE 55-2.)

Defendants' expert engineer, Keith Jackson, provided the following opinion:

Based on my personal observations, review of the condominium documents and public records of the Village of North Palm Beach, and interview with the property manager, the service court area at Lake Point Tower is properly designated and is currently being utilized for its proper purpose. My observations, document review, and interview with the property manager indicate that the service court area is intended for service and delivery access by trucks of all sizes, and is not intended or safe for residential automobile traffic. [I]t is not reasonable to designate a permanent residential parking space in Lake Point Tower's service court area.

---

[5] Plaintiffs point to evidence that the plans submitted by Defendants demonstrate that substantial areas of both decks are reinforced for vehicles. However, without an affidavit explaining these drawings, the Court is unable to draw any conclusions. (Plans at 42-43; attached to Jackson's expert report, DE 55-3.) There is evidence that a portion of the upper deck was reinforced to permit large trucks, like fire trucks and emergency vehicles, to utilize the upper deck. (Hackl Dep. 34, DE 55-9; Robert Chappell Dep. 15, DE 55-12.)

A designated service court area such as the one currently in existence at Lake Point Tower should be designed and maintained to separate trucks and other service vehicles from residential automobile traffic and pedestrians. The standards in the civil engineering industry for good site design practices recognize this concept and strive to keep these uses separate. The standard of care dictates that residential automobile traffic should not be combined with service and delivery vehicles in close proximity to each other. In maintaining and operating a service court area, it is imperative to keep the safety of resident automobile traffic and pedestrian traffic in mind at all times.

On December 19, 2012, I personally observed the service court area at Lake Point Tower in operation. During my visit, I observed several service vehicles, both parked and maneuvering, within the service court. Several vehicles were observed, with occupants going about their work, including furniture delivery, general maintenance, unknown service trucks parked with workers coming and going, and staging and prep work by service personnel. A review of photographs and interview with the property manager demonstrated individuals staging their work including carpet layout work, dumpster maintenance by large garbage trucks, pool servicing, individuals doing prep work for various projects, construction debris roll-off container staging, garbage collection, furniture unloading, and fire rescue response vehicles and fire fighters responding to an emergency call in the tower building. Multiple service vehicles are seen both parked and maneuvering in the service court area.

During my visit, I observed one residential automobile using the designated car wash. The car wash mechanism is a fixed structure with a single framework of tubing with water misters attached. The car wash is located directly across from the service court entrance and allows users to simply pull into the space, use a key to activate the wash mechanism while remaining in their vehicle, and then immediately exit the service court. The vehicle I observed took approximately one minute to complete the wash, with the driver remaining inside the vehicle and not interfering or endangering himself amongst the ongoing service activity.[6] As a convenience to residents, this minor use is compatible with the service nature of the area, as users do not exit the vehicle and are there only a short time.

Additionally, I observed the service area doors (two sets of double doors to provide a wide access point) at the rear of the tower building leading to a concrete service corridor within the main tower building. There was service activity coming and going from these doors into the rear service access area leading to the service court. This area is the main ingress and egress for workers, contractors, deliveries, garbage truck pickup from the dumpster enclosures, and fire department access. The fire department connection to the tower sprinkler system is located on the building wall in this area as well.

---

[6] The carwash that has been there for 15 years and is open twenty-four hours a day so any resident can use it at any time. (Chappell Dep. 24.) Generally, residents do not use the car wash during business hours. (Chappel Dep. 51-52; Romero Dep. 40.)

9

> Separate and apart from the service area access are double doors leading to and from the main tower lobby area into a common area with access to the pool area and the condominium units located on the southern portion of the property. The walkway area is pedestrian friendly and is clearly intended and designed to be separate from the service area to avoid resident interaction with commercial activity and to promote safe movement.
>
> Another smaller service access door was pointed out to me on the front side of the tower building, leading out to the main driveway. This single door access point appears to be useful for dropping off an individual or for a small delivery of some kind, although no users were observed during my visit. This sidewalk, single outside door, narrow hallway leading into the interior of the tower building, and single door inside the building leading to an interior carpeted hallway with access to the lobby is ideal for such a use. This access point would not be useful for larger deliveries, workers with large or heavy equipment, or contractors with men, materials, and any kind of staging area for work, as there is insufficient room for maneuvering, unloading, or staging and the potential for unsafe residential interaction with commercial activity. The designated service court and the adjacent double door service corridor on the south side of the building is the only appropriate access point for these commercial activities.
>
> I also observed the location of an "Owner's Loading and Unloading Zone – Max 15 minutes" sign and associated parking space located in the front corner of the service court. I was informed that this loading zone was intended for unit owners to park temporarily. While convenient and close to the southerly residential units themselves, permanent parking in this zone would not allow commercial vehicle traffic to safely maneuver into or out of the service court area without possible collision into a vehicle parked in this Zone or into resident pedestrian traffic. Accordingly, it is imperative that Lake Point Tower maintain the temporary nature of the loading and unloading zone and not allow permanent parking in this location.
>
> [I]t is my opinion that Lake Point Tower is currently utilizing its service court area for the proper and intended purpose. Lake Point Tower should continue to maintain their service court area for the exclusive use of service vehicles during business hours. Such use complies with the standard of care for site design and safety in the civil engineering industry. Designation of a permanent residential parking space in the service court area is inherently unsafe and would fail to meet the standard of care.

(Keith Jackson Decl. ¶¶ 4, 7-14, DE 55-3.)

Plaintiffs note that no resident has ever been injured in the service area and no traffic study has ever been completed of the property. (Romero Dep. 38, 53.)

II.  Summary Judgment Standard

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323.  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim.  Anderson, 477

U.S. at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted."  Anderson, 477 U.S. 242, 249-50.

III. Discussion

The Court finds that factual disputes preclude the entry of summary judgment.  At summary judgment, the Court must not engage in credibility determinations.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("credibility determinations, the weighing of evidence and the drawing of legitimate inferences from the facts are jury functions."); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1531 (11th Cir. 1987) (on a summary judgment motion, the court may not weigh the credibility of the parties); Delvalle v. Sanchez, 170 F. Supp. 2d 1254, 1279 n.27 (S.D. Fla. 2001) (credibility determinations are improper for a judge to make when considering evidence on a motion for summary judgment). With those principles in mind, the Court will set forth the controlling law and examine the parties' arguments.

To prevail on a Fair Housing Act ("FHA") claim brought pursuant to 42 U.S.C. § 3604(f)(3),[7] a plaintiff must establish that (1) she is disabled or handicapped within the meaning of the FHA; (2) she requested a reasonable accommodation; (3) such accommodation was necessary to afford her an opportunity to use and enjoy her dwelling and (4) the defendant refused to make the requested accommodation.  Hawn v. Shoreline Towers Phase I

---

[7] Florida courts have applied the FHA to the Florida Fair Housing Act. Dornbach v. Holley, 854 So. 2d 211, 213 (Fla. Dist. Ct. Appl. 2002).

Condominium Assoc., Inc., 347 F. App'x. 464, 467 (11th Cir. 2009) (citing Schwarz v. City of Treasure Island, 544 F.3d 1201, 1218-19 (11th Cir. 2008)).  A plaintiff, however, is not entitled to the accommodation of his or her choice, but is entitled only to a reasonable accommodation. Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir. 1997). "Whether an accommodation is reasonable depends on specific circumstances."  Terrell v. USAir, 132 F.3d 621, 626 (11th Cir. 1998); see also Loren v. Sasser, 309 F.3d 1296, 1302 (11th Cir. 2002) ("Whether a requested accommodation is required by law is highly fact-specific, requiring case-by-case determination.") (internal quotation marks omitted). Under the FHA, plaintiffs have the burden of proving that a proposed accommodation is reasonable. Loren v. Sasser, 309 F.3d 1296, 1302 (11th Cir. 2002).

      The Court will first address whether Mrs. Solodar has a disability.  An individual is handicapped, for the purposes of the Fair Housing Act, if she has (a) "a physical or mental impairment which substantially limits one or more of such person's major life activities," (b) "a record of such impairment," or (c) is "regarded as having such an impairment." 42 U.S.C. § 3602(h)(1)-(3); see Loren v. Sasser, 309 F.3d at 1302.  With respect to whether Mrs. Solodar is "substantially limited" in a major life activity, the Court finds the record evidence creates a question of fact that cannot be resolved at summary judgment.  On one hand, Defendants have submitted the declaration of Dr. Russo, a board certified cardiologist, who states that, based on his examination of Mrs. Solodar's medical records, Mrs. Solodar is not substantially limited in the major life functions of walking, climbing stairs or general mobility.  On the other hand, Plaintiffs point to the declaration of  Dr. Mohanty who states that Mrs. Solodar's mobility and everyday life activities, such as walking and breathing, are limited by her cardiovascular

condition.

Plaintiffs also argue that Mrs. Solodar has a history of an impairment and that Defendants regarded her as having an impairment. To demonstrate a "history of impairment," however, Plaintiffs must still show that Mrs. Solodar actually suffers from a physical impairment that substantially limits one or more of her major life activities, See Hilburn v. Murata Electronics N. Am, Inc., 181 F.3d 1220, 1229 (11th Cir. 1999).[8] As highlighted supra, there is a factual question on this issue that the Court cannot resolve as a matter of law.

Finally, Plaintiffs argue that Defendants "regard" Mrs. Solodar as disabled. In support, Plaintiffs contend that Defendants "regard any resident who possesses a state-issued disability parking placard and a letter from their doctor as disabled and eligible for a[n] accessible parking place." (DE 51 at 9; DE 65 at 6.) The "regarded as" prong is focused on "the impairment's effect upon the attitude of others." Gordon v. E.L. Hemm & Assocs., Inc., 100 F.3d 907, 913 (11th Cir. 1996). Put another way, this provision is "intended to combat the effects of archaic attitudes, erroneous perceptions, and myths that have the effect of disadvantaging persons with, or regarded as having, disabilities." Id. "Regarded as" having a disability also requires that Defendants believed that Mrs. Solodar's impairment "substantially limited" her performance of a major life activity. Jones v. STOA International/Florida, Inc., 422 F. App'x 851, 853 (11th Cir. 2011). Here, Defendants point to record evidence that they did not regard Mrs. Solodar as disabled

---

[8] Plaintiff argues that the new amendments of the Americans with Disabilities Act ("ADA") lowered the standard for "substantially limits" and these amendments should be applied to the FHA. ADA Amendments Act of 2008 ("ADAAA"). 42 U.S.C.A. § 12102(4)(E)(i) (2009) (the "ADAAA"). Whether or not this new standard should be applied to the FHA need not be decided at this time because, even with applying that new standard, questions of fact would remain.

which Plaintiffs are unable to challenge. (Muelder Dep. 70, 83.)

Likewise, whether or not the accommodation offered by Defendants or proposed by Plaintiffs was reasonable is also a factual question. As Defendants point out, they granted a 15 minute owners' loading zone in the area requested by Plaintiffs in their November 10, 2010 letter. Defendants also offered Mrs. Solodar, in exchange for her current parking space in the garage, a designated parking space on the parking deck in front of the building for her exclusive use or, a designated parking space in the garage, directly adjacent to the tower elevators, for her exclusive use.

Plaintiffs contend that Defendants' proposed accommodations are not reasonable and that Mrs. Solodar's request for a handicapped parking space in the service court is reasonable based on no prior injuries in the service court parking area and the presence of a 24-hour car wash and a loading zone in the service area. In addition, Plaintiffs point out that there is alternate parking for vendors on the upper parking deck in the front of the building and no traffic study has ever been conducted on the condominium property. Defendants, however, point to record evidence that Lake Point Tower has safety, logistical and liability concerns related to allowing a unit owner to park permanently in the service area. The Court cannot determine, as a matter of law, whether the parking accommodations offered by Defendants are unreasonable and whether the safety concerns of Defendants are significant enough to make Plaintiffs' suggested accommodation unreasonable.

For the foregoing reasons, the Court denies the motions for summary judgment.

IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1) Plaintiffs' Motion for Summary Judgment (DE 51) is **DENIED.**

2) Defendants' Motion for Summary Judgment (DE 56) is **DENIED**.

3) Plaintiffs' Motion to Strike Portions of Second Declaration of Andy Romero (DE 72) is **DENIED AS MOOT**.

4) Defendants' Motion to Strike Plaintiffs' Untimely Notice of Filing and Declaration of Donald Solodar (DE 80) is **DENIED AS MOOT.**

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 26th day of July, 2013.

_____
KENNETH A. MARRA
United States District Judge